**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARIA DELGADO, | |
| Plaintiff, | |
| v. | Case No. 21 C 4849 |
| | Judge Sunil R. Harjani |
| SMITHFIELD PACKAGED MEATS CORP., | |
| Defendant. | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Maria Delgado worked for Smithfield Packaged Meats Corp. ("Smithfield") for approximately two and a half years before being terminated in August 2019. Following her termination from Smithfield, Delgado initiated this action alleging violations of the Americans with Disabilities Act and the Illinois Human Rights Act. Delgado asserts that she was disabled due to a shoulder injury while employed with Smithfield. She claims that Smithfield accommodated her shoulder ailment by placing her on transitional duty but in August 2019, refused to continue providing her with a reasonable accommodation and terminated her employment. Delgado further alleges that she was subjected to a hostile work environment on the basis of her disability and requests for reasonable accommodation. Smithfield now moves for summary judgment on all claims. For the reasons explained below, the Court grants in part and denies in part Smithfield's motion for summary judgment.

## I. Background[1]

The Court construes the evidence in the summary judgment record in favor of Delgado and draws all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Smithfield is a leading pork producer and food-processing company. PRDSOF ¶ 1.[2]

---

[1] Delgado filed a Response to Smithfield's Statement of Material Fact as required by Local Rule 56.1(b)(2). Smithfield argues that the Court should disregard several paragraphs of Delgado's responses to Smithfield's Statement of Material Facts because they fail to comply with Local Rule 56.1(e)(2) and (3). Smithfield asks the Court to disregard responses to paragraphs 28, 30, and 32 because they fail to specify which portions of the response are admitted or disputed. Delgado's responses to paragraphs 28, 30, and 32 object to a specific portion of Smithfield's particular statement of fact and are silent as to the remainder. Where Delgado did not respond, the Court will deem that portion of the statement of fact admitted. But the Court exercises its discretion and declines to disregard the entirely of responses to paragraphs 28, 30, and 32. Additionally, Smithfield points out that responses to paragraphs 10, 28, 30, 32, 39, 46, and 47 set forth new facts that are not fairly responsive to the asserted fact to which the response is made. Though Delgado's responses do reference additional and somewhat tangential facts, they are fairly responsive to the asserted fact to which the response is made. In its discretion, the Court declines to disregard Delgado's responses on this basis. Smithfield also points out that responses to paragraphs 10, 30, 39, 46, and 47 improperly assert legal arguments. To the extent the Court agreed with Smithfield, it did not consider any improper argument in Delgado's responses to the statements of facts. Further, Smithfield objects to Delgado's response to paragraph 21 because it does not provide evidentiary support required to dispute an asserted fact. Smithfield's paragraph 21 states: "Smithfield never assigned Ms. Delgado work outside of her medical restrictions." DSOF ¶ 21. Delgado does not dispute this except to the extent that she "was directed by Supervisor Rob Taylor to perform a task that she could not complete within her work restrictions." PRDSOF ¶ 21. Delgado's response is supported by specific citation to evidentiary material. The cited portion of Delgado's deposition transcript indicates that Taylor encouraged Delgado to try performing various tasks with her medical restrictions. Def.'s Ex. 1, Delgado Dep.,107:8-108:14. On one occasion, he directed her to perform an assignment requiring her to put slices in a plastic pouch. Delgado believed she would not be able to perform the task. *Id.* Nevertheless, Taylor encouraged her to try, and when the task proved too difficult for Delgado, he assigned her to a different task that she was able to perform with her medical restrictions. *Id.* Because Delgado's response is supported by her deposition testimony, the Court has considered the evidence cited by Delegado in her response and in the statement of additional facts. *See* PSOAF ¶ 21. Smithfield also objects that Delgado explicitly testified during her deposition that Smithfield never assigned her work outside of her medical restrictions. Doc. 27-1, Def.'s Ex. 1, Delgado Dep. 33:15-21. It is not clear that Delgado's limited denial is contradicted by her earlier deposition testimony. On summary judgment, to the extent Delgado's deposition can be interpreted in multiple ways, such facts should be viewed in the light most favorable to Delgado as the non-moving party. The facts in the light most favorable to Delgado show that on one occasion, Taylor directed Delgado to try performing a task she believed she could not perform and then, was unable to perform, but also that ultimately, she was never assigned work outside of her medical restrictions.

[2] The Court has taken the facts from the parties' Local Rule 56.1 statements. Unless otherwise noted, the following facts are not in dispute. The Court cites to Defendant's LR 56.1 statement of facts as "DSOF," Plaintiff's response to Defendant's LR 56.1 statement of facts as "PRDSOF," Plaintiff's Statement of Additional Facts as "PSOAF," and Defendant's response to Plaintiff's statement of additional fact as "DRPSOAF."

Delgado was hired by Smithfield to work at the company's facility in St. Charles, Illinois (the "St. Charles Plant") as a Packer/Peeler in March 2017. *Id*. In her role as a Packer/Peeler, Delgado was required to rotate through various tasks and alternate between packing and peeling dry sausages. *Id*. at ¶ 2.[3] "Peeling" includes cutting and removing dry sausages from hanging sticks using a knife, cutting the ends of the product, removing the product's outer casing, and placing the product into a container. *Id*. at ¶ 3. "Packing" includes removing the product from the packing line, packing it into a case, and moving the container to another conveyor where the container is taped closed. *Id*. at ¶ 4. The Packer/Peeler position also requires lifting dry sausage that weighs approximately 12 pounds, manually adjusting dry sausages in their containers, moving boxes of product weighing up to 25 pounds and loading them onto pallets, and using a knife to cut open and perform rework activities on packaged meat. *Id*. at ¶ 5. Due to Delgado's height and the nature of the tasks, she had to raise both of her arms overhead to cut the sausage off of the hanging sticks. *Id*. at ¶ 6.

The St. Charles Plant has a unionized workforce, and during her employment with Smithfield, Delgado was a member of United Food and Commercial Workers International Union Local No. 1545. PRDSOF at ¶ 7. Pursuant to the Collective Bargaining Agreement in effect during Delgado's employment with Smithfield, employees typically bid for regular vacant positions based on a seniority system. *Id*. at ¶ 8.

On March 27, 2017, Delgado was injured during her shift at the St. Charles Plant when she tripped and fell. PRSDOF ¶ 9. Delgado reported the injury to then-Production Superintendent Michael Tschannen, who provided her with ice packs and advised icing the affected area in 15 minute intervals. *Id*. at ¶ 10. Subsequently, Tschannen arranged for Delgado's transportation to a

---

[3] Delgado objected that the term "required" in paragraph 2 and "requires" in paragraph 5 of Smithfield's Statement of Material Facts is somehow vague and ambiguous, but Delgado does not explain why. Given that Delgado does not explain the basis for her objections and the Court does not find the terms "required" or "requires" vague or ambiguous, her objections are overruled.

local hospital for evaluation. *Id*. at ¶ 11. Delgado was diagnosed with a left shoulder dislocation and released to return to work with restrictions, including no use of her left arm. *Id*. at ¶ 12. Delgado claims that immediately upon suffering her injury, Smithfield created a hostile work environment on the basis of her shoulder injury.

When Delgado returned to work on March 29, 2017, she was placed in Smithfield's Return to Work Program, which is part of its workers' compensation program. PRDSOF ¶ 13. The Return to Work Program is designed to provide employees who sustain work-related injuries with temporary, transitional work assignments until they are able to return to their regular position. This allows employees to continue to receive pay and other benefits while they recover from a work-related injury. *Id*. at ¶ 14. Smithfield clearly communicates to all employees in the Return to Work Program that these assignments are temporary and will not become permanent and conveyed the same message to Delgado. *Id*. at ¶ 15. Specifically, the "While in the Return to Work Program" form Delgado signed on October 26, 2017 regarding the Return to Work Program states:

> Based on the physical restrictions your physician outlines, you may be placed in a temporary assignment that allows you to accomplish productive work while preparing to return to your regular job. This program has been designed to provide Transitional Work to injured employees by allowing them to continue receiving pay and benefits while recovering . . . . Transitional work is **temporary** and all Transitional Work Assignments are evaluated on a case-by-case basis. **No Transitional Work Assignment will become permanent**.

*Id*. at ¶ 16 (emphasis in original). Between March 27, 2017, when she injured her shoulder, and the termination of her employment with Smithfield on August 7, 2019, Delgado was assigned various temporary light duty assignments in accordance with her medical restrictions as part of Smithfield's workers' compensation program. *Id*. at ¶ 17. As an example, when Delgado returned to work on March 29, 2017, she received a transitional duty assignment and offer from Smithfield

and was assigned to reorienting half pieces of sausage on the production line using her right hand. *Id*. at ¶ 18.

On October 16, 2017, Delgado began a leave of absence for a shoulder manipulation procedure. PRDSOF ¶ 19. She returned from leave on October 23, 2017 with restrictions of no movement above her left shoulder and no lifting more than five pounds. *Id*. When she returned from leave, Smithfield accommodated her restrictions, and she received a transitional duty assignment and offer of peeling product within her restrictions through the use of her right hand. *Id*. As part of this assignment, she was not required to cut dry sausages down from their hanging sticks. *Id*. While in the Return to Work Program, Delgado was directed to try to perform various work tasks with her medical work restrictions and on one occasion was unable to perform a task requiring slices to be placed in a plastic pouch. PSOAF ¶ 21. When that task proved too difficult for Delgado, Smithfield assigned her to a different task within her medical restrictions. Ultimately, Smithfield never assigned Delgado work outside of her medical restrictions. PRDSOF ¶ 21; PSOAF ¶ 21.

On May 2, 2019, Dr. Prasant Atluri conducted an independent medical examination of Delgado and concluded that she had reached maximum medical improvement for her shoulder injury. PRDSOF ¶ 37. Dr. Atluri determined that Delgado was not capable of resuming her full-duty work as a Packer/Peeler and that reasonable permanent restrictions included avoidance of any overhead use of the left upper extremity, no frequent reaching with the upper left extremity, and no lifting of more than five pounds below shoulder level. *Id*. at ¶ 38. After Delgado reached maximum medical improvement, Steven Laing, Plant Human Resources Manager, Chris Daloia, Production Supervisor, and Luis Perez, Union Steward, met with Delgado on May 30, 2019 to engage in the interactive process and determine whether there was a reasonable accommodation

that would allow her to perform the essential functions of the Packer/Peeler position. *Id*. at ¶ 39.[4]
During the meeting, they discussed Delgado's permanent medical restrictions and the essential job
functions of the Packer/Peeler position. *Id*. at ¶ 40.  Delgado did not have any suggestions for how
her restrictions could be reasonably accommodated in the Packer/Peeler position, but she received
Smithfield's Request for Disability-Related Accommodation Form to complete. *Id*. at ¶ 41.

On June 11, 2019, Delgado returned the completed Disability-Related Accommodation
Form, which reaffirmed that her permanent restrictions included no overhead use of her left arm,
no frequent reaching, or lifting more than five pounds with her left arm. PRDSOF ¶ 42.  On the
form, Delgado requested that she be transferred to a position within her medical restrictions, or
that she be allowed to remain in her current light duty position. *Id*. at ¶ 43.  Transferring to another
position within her medical restrictions or staying "in the position that [she] was at for six months"
(i.e., remaining in her light duty position), were the only accommodations Delgado requested for
her shoulder injury during her employment with Smithfield. *Id*. at ¶ 44.  Prior to May 30, 2019,
Delgado had never requested an accommodation from Smithfield. *Id*.

---

[4] In response to Smithfield's statement of fact in paragraph 39, Delgado indicates that she denies the asserted
fact "to the extent that there was no attempt to determine whether there was a reasonable accommodation
that could be given her." PRDSOF ¶ 39.  Rather than addressing the substance of the asserted fact, she
merely includes additional facts in an attempt to support her denial.  However, Delgado's additional facts
do not actually dispute the proposed statement.  For example, Delgado denies Smithfield's statement as
follows: "Laing testified that he and his supervisor, Human Resources Director Annett Mollett, made the
decision that Plaintiff could not perform the essential functions of her position, but when he was asked why
she could not have remained in the position she was performing between December 2018 through August
2019, he responded, "No. I don't know why." *Id*.  This additional fact does not dispute that Laing, Daloia
and Perez met with Delgado on May 30, 2019 to engage in the interactive process and determine whether
there was a reasonable accommodation that would allow her to perform the essential functions of the
Packer/Peeler position.  Because her additional facts do not actually serve to dispute the asserted fact, the
asserted fact is deemed admitted.  The additional facts included as part of Delgado's support for denying
the asserted fact are considered because they were presented in her Local Rule 56.1(c)(2) statement. *See*
PSOAF ¶¶ 28, 29.

At the time she submitted her request for accommodation, Delgado was assigned to a light duty position that consisted of visually inspecting product as it passed her on the production line (the "visual inspection position"). PRDSOF ¶ 45. This was not a permanent full-time position. Instead, this was a temporary position that Smithfield utilized for Delgado and other employees with extensive physical restrictions. *Id.* at ¶ 46.[5] At the time Delgado submitted her request for accommodation, there were no open, available jobs at the St. Charles Plant within her medical restrictions. *Id.* at ¶ 47.[6] Delgado's employment with Smithfield was terminated on August 7,

---

[5] Relying exclusively on the deposition testimony of Laing, Delgado attempts to rebut Smithfield's statement that the visual inspection position was temporary and not a permanent position. PRDSOF ¶ 46. But Laing's testimony does not actually serve to dispute the asserted fact. Laing testified that the determination that Delgado could not perform the essential functions of her Packer/Peeler position was collectively made between Smithfield's corporate and plant levels based on the documents they received. Doc. 27-1, Def's Ex. 13, Laing Dep. at 33:18-34:34:1. As part of that process, Laing also testified that he recalled only personally working with his supervisor, Human Resources Director Annett Mollett. *Id.* at 34:15-18. When asked why Delgado could not have remained in the visual inspection position, Laing answered "I don't know why." *Id.* at 35:19-36:1. However, Superintendent Michael Tschannen explained that the visual inspection position assignment was sometimes used for employees who "couldn't do much" because of their restrictions. Doc. 27-1, Def's Ex. 3, Tschannen Dep. at 48:11-49:18; *see also* Doc. 27-1, Def's Ex. 6; Def's Ex. 15 (describing the visual inspection position as a "temporary transitional duty assignment."). Laing's testimony ("I don't know . . .") does not refute Smithfield's evidence on this point. Laing did not state that the visual inspection position was a permanent position, not a temporary one, and nothing in the record supports Delgado's suggestion that her visual inspection position at Smithfield was not temporary. Delgado also relies on Laing's statement, "I can't specifically articulate what that would be," when asked how allowing Delgado to remain in her light-duty position would be an undue hardship for Smithfield, and that Laing testified that he did not consult with Tschannen or Delgado's supervisors when assessing Delgado's request for an accommodation or whether there was any position or task she could be assigned to on a permanent basis. This testimony by Laing does not refute Smithfield's evidence that the visual inspection position was temporary. Further, whether allowing Delgado to permanently remain in the visual inspection position would have created an undue hardship on Smithfield's operations is legally irrelevant because such a request is unreasonable (as explained later in the Discussion section). So, there is no need to consider the question of undue hardship. It is thus undisputed that the visual inspection position was not a permanent, full-time position.

[6] Delgado attempts to dispute Smithfield's evidence that there were no open, available jobs at the St. Charles Plant within her medical restrictions at the relevant time by referring to Laing's testimony. Delgado points out that Laing testified that he was "not aware" of any vacant positions Delgado could perform with her restrictions, but claims "he does not indicate that, in fact, there were no positions or that he even checked if there were any positions she could perform with her restrictions." PRDSOF ¶ 47. However, Laing testified that the interactive conversation with the corporate department includes consideration of whether available, vacant positions exist which the employee can perform. Doc. 27-1, Def's Ex. 13 at 34:19-35:9. Because Delgado does not identify any evidence to contradict Laing's testimony that he was not aware of

2019. *Id*. at ¶ 48. At the time she was terminated, Delgado could not lift boxes weighing 20 or more pounds, could only lift dry sausage weighing 12 pounds with her right arm, and could not cut and remove dry sausage from the wooden sticks where they hung. *Id*. at ¶ 49.

Delgado brings three claims under the ADA. First, she claims that Smithfield denied her reasonable accommodations by removing her from her current light duty position and by rejecting her request to transfer to another position within her medical restrictions. Second, Delgado claims that Smithfield terminated her because of her disability. Third, she claims that various incidents between March 27, 2017, when she injured her shoulder, and August 2019, when she was terminated, created a hostile environment for her based on her disability. Smithfield counters that Delgado fails to establish the *prima facie* case for her claims for failure to provide a reasonable accommodation and disparate treatment and the alleged conduct does not rise to the level of creating a severe or pervasive hostile work environment.

## II. Discussion

Delgado brings her claims under the ADA and IHRA, but the legal standard is the same under both. *Tate v. Dart*, 51 F.4th 789, 793 (7th Cir. 2022) ("Illinois courts analyze IHRA claims under a framework that is practically indistinguishable from the ADA framework."); *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019). Delgado's response brief does not mention her claims under the IHRA, let alone suggest that the analysis of her claims under the IHRA differs from that under the ADA.[7] Thus, the Court focuses on her federal ADA claims. Under the ADA,

---

any other positions Delgado could perform with her restrictions, she has not created a genuine issue of fact as to available vacant positions which she could perform. Moreover, Delgado does not refute the other evidence offered by Smithfield to support the asserted fact. PRDSOF ¶ 47; Def's Ex. 3, Tschannen Dep. at 60:8-62:16; Def's Ex. 6. It is thus undisputed that there were no vacant jobs at the St. Charles Plant which Delgado could perform at the time she was terminated.

[7] Smithfield argues that Delgado has abandoned her claims under the IHRA by omitting any discussion or even reference to them in her Opposition. Doc. 40 at 4. Since the same analysis generally governs both

an employer may not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5); *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1053 (7th Cir. 2024).

## A. Failure to Accommodate

Delgado's first claim is that Smithfield failed to accommodate her disability. "Recovery under a failure to accommodate theory requires proof that: (1) the plaintiff was a qualified individual with a disability; (2) the defendant was aware of the plaintiff's disability; and (3) the defendant failed to reasonably accommodate the plaintiff's disability." *Bruno*, 93 F.4th at 1053. To satisfy the third element, the ADA requires employers and employees to engage in an interactive process to determine a reasonable accommodation. *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019). "If the plaintiff establishes these elements of the prima facie case, the burden shifts to the employer to prove that the requested accommodation would impose an undue hardship on the operation of the defendant's business." *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021). Smithfield does not contest that Delgado had a shoulder disability of which it was aware. Instead, Smithfield argues Delgado fails to show the first and third elements of a failure to accommodate claim.

---

statutes at issue and Delgado discussed her failure to accommodate and hostile work environment claims under the ADA, the Court declines to find that Delgado abandoned her similar claims under the IHRA. However, Delgado did not respond to Smithfield's argument that the same analysis applies under the IHRA and ADA in this case. Consequently, Delgado waived any argument that the IHRA analysis differs in any material respect from the ADA analysis here.

### 1. Qualified Individual with a Disability

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To determine if an employee is a qualified individual, courts "first consider whether the individual satisfies the prerequisites for the position and then turn to the question of whether the individual can perform the essential functions of the job with or without reasonable accommodation." *Smithson v. Austin*, 86 F.4th 815, 820 (7th Cir. 2023). Within this analysis, courts must consider whether a particular duty is an essential function of the job. *Id.* This inquiry involves consideration of many factors including "the employer's judgment, the employee's written job description, the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Id.*

Smithfield contends that Delgado is not a qualified individual because at the time her employment was terminated, she was unable to perform the essential functions of the Packer/Peeler position with or without reasonable accommodation. In opposing summary judgment, Delgado maintains that she was a qualified individual and could perform the essential functions of her job with or without an accommodation because she was able to successfully perform her light duty assignment for eight months prior to her termination. Doc. 35 at 14. To determine whether Delagado could perform the essential functions of her job without reasonable accommodation, the Court considers the duties of her Packer/Peeler position and her condition at the time of her termination. *See Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998) (the "determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision."); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908,

912 (7th Cir. 1996) (to "be protected under the ADA, [plaintiff] must be qualified to do the job and, with reasonable accommodations for his disability, *be able to perform the essential functions of that job which he currently holds.*") (emphasis in original).

Delgado has failed to raise a genuine issue of material fact regarding whether she was able to perform the essential functions of the Packer/Peeler position *without* a reasonable accommodation at the time of her termination. The parties agree that Delgado was hired by Smithfield as a Packer/Peeler. PRDSOF ¶ 1. Smithfield argues that the essential functions of Delgado's Packer/Peeler position required, among other things, raising both arms overhead to cut and remove dry sausage from hanging sticks, lifting and handling sausages that weighed approximately 12 pounds, and moving containers of product weighing up to 25 pounds. Doc. 26 at 10-11; DSOF ¶¶ 2-6. These tasks are specified in Smithfield's written Packer/Peeler Training Checklist and Job Analysis Report. Doc. 27-1, Def's Ex. 4, pp. 1, 4, 6; Def's Ex. 5, p. 2. Moreover, Delgado acknowledged during her deposition that these tasks are necessary. Doc. 27-1, Def's Ex. 1, 8:6-11:22; 64:24-65:2. In her response brief, Delgado does not dispute whether any of the functions Smithfield identified were essential functions of the position.[8] Doc. 35 at 14-15. She argues only that she could perform the essential functions of her job with accommodation. *Id.* Delgado has thus presented nothing to raise a genuine issue of material fact questioning the importance of raising arms overhead and lifting to job performance. *Conners*, 984 F.3d at 1261-62 (courts "presume that an employer's understanding of the essential functions of the job is

---

[8] In her Response to Smithfield's Statement of Material Facts, Delgado asserts that she "does not admit" that lifting dry sausage that weighs approximately 12 pounds, adjusting dry sausages in their containers, and moving boxes of product weighing up to 25 pounds and loading them onto pallets are essential functions of the Packer/Peeler position. PRDSOF ¶ 5. But her Response admits that Packer/Peelers "normally" perform these functions. *Id.* Moreover, Delgado does not point to any evidence undermining Smithfield's description and evidence of these functions as Packer/Peeler essential functions.

correct, unless the plaintiff offers sufficient evidence to the contrary.") (internal quotes and citation omitted).

When her employment was terminated, Delgado's permanent medical restrictions included no overhead use of the left upper extremity, no frequent reaching with the upper left extremity, and no lifting of more than five pounds below shoulder level. PRDSOF ¶ 38. She concedes that at the time of her termination, she could not lift boxes weighing 20 or more pounds, could only lift dry sausage weighing 12 pounds with her right arm, and could not cut and remove dry sausage from the wooden sticks where they hung. *Id*. at ¶ 49. As a result, the undisputed record indicates that Delgado was incapable of performing the essential functions of a Packer/Peeler without a reasonable accommodation.

Likewise, no reasonable jury could find on this record that Delgado could perform the essential functions of the Packer/Peeler position *with* a reasonable accommodation. It is Delgado's "burden to produce evidence sufficient to permit a jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation." *Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). Delgado must also show that she requested an accommodation for her left shoulder injury. *Stelter v. Wisconsin Physicians Serv. Ins. Corp.*, 950 F.3d 488, 491 (7th Cir. 2020).

Remaining in her light duty position or transferring to another position within her medical restrictions were the only accommodations Delgado requested for her shoulder injury. PRDSOF ¶ 44. Even though Delgado requested these accommodations, her claim fails because the two proposed accommodations are not in fact reasonable accommodations. With respect to her request to stay in her light duty position, Delgado emphasizes that she "successfully completed her duties working on inspection in plant 2, line 1 for eight months." Doc. 35 at 14. She says this evidence

demonstrates that she could perform the essential functions of her Packer/Peeler position with an accommodation.

The problem with Delgado's argument is that the light duty visual inspection position was not a full-time position. PRDSOF ¶¶ 45, 46. Instead, it was a temporary light duty position that Smithfield utilized for Delgado and other employees with extensive physical restrictions. *Id.* at ¶ 46. The Seventh Circuit has determined that a request to be assigned to a permanent light duty position is not a form of reasonable accommodation as a matter of law. *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 680 (7th Cir. 2010) (an employer has no "duty to reassign an employee to a permanent light duty position."); *see also Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) ("[T]he ADA does not require an employer that sets aside a pool of positions for recovering employees to make those positions available indefinitely to an employee whose recovery has run its course."); *DeVito v. Chicago Park Dist.*, 270 F.3d 532, 534 (7th Cir. 2001) ("the ADA does not require permanent assignment to a temporary light-duty job."); *Malabarba v. Chi. Tribune Co.*, 149 F.3d 690, 697 (7th Cir. 1998) ("Although the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it does not require that employers convert temporary 'light-duty' jobs into permanent ones."). Requiring employers to offer temporary-duty positions to permanently disabled employees under the ADA would effectively "abolish (in whole or in part) the temporary disability program, leaving nothing for that group of employees." *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 680 (7th Cir. 1998). To hold otherwise, would require employers to "create new-full time positions to accommodate [] disabled employees, a course of action not required under the ADA." *Id.* Delgado does not address these cases.

13

The only case Delgado cites in support of her argument that she was a qualified individual because she was able to successfully perform her light duty assignment for eight months prior to her termination, *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008), is easily distinguishable. In that ADA case, the plaintiff held the position of Staff Claims Service Adjuster during the period of time relevant to the suit. *Id*. at 542. To accommodate the plaintiff's medical condition, her employer allowed her to work in the company's "huddle room." *Id*. at 543-44. The Seventh Circuit held that the plaintiff could perform the essential functions of her Staff Claims Service Adjuster position because she successfully met her performance standards when she was allowed to work in the huddle room for two to three months. *Id*. at 545. In contrast to Delgado's proposed accommodation, the plaintiff in *Mobley* was not transferred to a light duty position and allowed to remain in that position as an accommodation. Rather, she was provided with an accommodation that allowed her to perform the essential functions of the position she held before she became disabled. Accordingly, no jury could reasonably find that Smithfield's refusal to create a permanent light-duty assignment for Delgado amounted to a failure to accommodate her disability.

Delgado's reassignment accommodation request also falls shorts. A reasonable accommodation under the ADA may include "reassignment to a vacant position."[9] 42 U.S.C. § 12111(9)(B). It is Delgado's "burden to prove that there was a vacant position for which she was qualified" at the time of her termination. *Conners*, 984 F.3d at 1262; *Severson v. Heartland*

---

[9] Under the IHRA, the "duty to accommodate only requires employers to accommodate a [disabled] employee in the employee's present position for which she was hired." *Fitzpatrick v. Human Rights Com'n*, 642 N.E.2d 486, 491 (Ill. App. 1994); *see also Whitmore v. Human Rights Commission*, 2020 WL 1083766, at *7 (Ill. App. Feb. 18, 2020) ("[I]f an employee is incapable of performing his or her present job, the duty of reasonable accommodation does not extend to giving the employee another job which that employee can perform."). Accordingly, under the IHRA, Smithfield was not required to reassign Delgado to a different vacant position, even if one had been available.

*Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017). Delgado's request to transfer to another position fails because she has not identified any evidence establishing that positions were vacant for which she was qualified during the relevant time period. On the other hand, Smithfield has presented undisputed evidence establishing that there were no open positions at the St. Charles Plant within Delgado's medical restrictions at the time her employment was terminated. PRDSOF ¶ 47. Because Delgado has failed to point to evidence that Smithfield had a vacant position for which she was qualified at the time she was fired, reassignment to another position within her medical restrictions was not a reasonable accommodation and thus, not required under the ADA.

Finally, Smithfield was not obligated to remove another employee from their position or create a new job in order to accommodate Delgado. *Vargas v. DeJoy*, 980 F.3d 1184, 1189 (7th Cir. 2020) (employer is not "obligated to create light duty work for [an employee] where none existed."); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) ("an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee."). Further, Delgado, as a member of the collective bargaining unit at the St. Charles Plant, had "no right to superseniority" over members of the union with seniority. *Cochrun*, 102 F.3d at 912-13 ("An employer is not required to violate the provisions of a collective bargaining agreement to reassign a disabled employee pursuant to the ADA."); *Ecles v. Consolidate Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996). As such, the Court finds that Delgado offered no evidence that she could perform the essential functions of any vacant position at Smithfield. Delgado has not shown that a genuine factual dispute exists concerning her ability to perform the essential duties of a Packer/Peeler with a reasonable accommodation.

For these reasons, a reasonable jury could not conclude on this record that Delgado was a qualified individual when she was terminated.

### 2.  Reasonable Accommodation

The Court turns to the third element of Delgado's prima facie case for failure to accommodate.  Smithfield argues that it did not deny Delgado a reasonable accommodation for her shoulder injury because no such accommodation existed.  A "reasonable accommodation" is one that allows the disabled employee to "perform the essential functions of the employment position." 42 U.S.C. § 12111(8).  Upon receiving an accommodation request, the ADA requires an employer to "engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013), *overruled on other grounds*, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

After Delgado reached maximum medical improvement for her shoulder injury, Smithfield and Delgado engaged in the interactive process. PRDSOF ¶¶ 39-40.  Smithfield determined there was no reasonable accommodation that would allow Delgado to perform the essential functions of her Packer/Peeler position.  Although Delgado requested that she be allowed to remain in her light duty position or transferred to another position within her medical restrictions during the interactive process, "[a]n employer is not obligated to provide an employee the accommodation [s]he requests or prefers . . . ." *Gile.*, 95 F.3d at 499; *Chloe*, 712 F.3d at 1178 ("an employer is not required to provide the exact accommodation requested.").  Rather, "the employer need only provide some reasonable accommodation." *Gile*, 95 F.3d at 499.

Delgado points to Laing's deposition testimony to argue that Smithfield was capable of providing her with a reasonable accommodation and failed to do so. Doc. 35 at 12-15.  Specifically, Delgado relies on: (1) Laing's statement, "No. I don't know why," when asked why Delgado could

not have remained in her light-duty position; (2) Laing's statement, "I can't specifically articulate what that would be," when asked how allowing Delgado to remain in her light-duty position would be an undue hardship for Smithfield; and (3) Laing's testimony that he did not consult with Tschannen or Delgado's supervisor's when assessing her request for an accommodation or whether there was any position she could be assigned to on a permanent basis within her medical restrictions. Delgado also claims that in November 2018 when she had not yet been released to work after her September 24, 2018 surgery, Tschannen told her, "If you want to come back to work, we always have something for you to do." PSOAF ¶ 24; Doc. 35 at 15.

None of this evidence demonstrates that a reasonable accommodation was in fact possible, and Smithfield did not offer it. The undisputed evidence in the record shows that Smithfield looked for other positions for Delegado and there were no vacant positions available that complied with her medical restrictions at the time she was terminated. Doc. 27-1, Def's Ex. 13, Laing Dep. 34:19-35:9; Doc. 27-1, Def's Ex. 23. It is Delgado's burden to show that other positions were available but not offered to her, which she has failed to do. *Anderson v. Lawrence Hall Youth Servs.*, 2024 WL 1342586, at *2 (7th Cir. 2024*), reh'g denied*, 2024 WL 1979971 (7th Cir. May 3, 2024). Whether Laing knew why Delgado could not have remained in her light-duty position does not matter because, as previously explained, Delgado's request to remain on permanent light duty was an unreasonable accommodation as a matter of law. *Petersen v. Mabus*, 112 F.Supp.3d 733, 742 ("It is widely accepted that an employer has no "duty to reassign an employee to a permanent light duty position."") (*quoting Gratzl*, 601 F.3d at 680). Smithfield also had no duty to create a vacancy or a new position. *Anderson*, 2024 WL 1342586, at *2. Moreover, the issue of undue hardship is irrelevant to the threshold inquiry of whether the employer failed to reasonably accommodate the disability. "Undue hardship is a defense and does not come into play until [a plaintiff] establishes

her prima facie case." *Conners*, 984 F.3d at 1262.[10]  Further, Tschannen's alleged statement in November 2018, before Delgado reached maximum medical improvement in May 2019, does not create a genuine dispute of fact on the issue of whether Smithfield denied Delgado a reasonable accommodation at the time of her termination.

In addition, Delgado has not established that the interactive process was insufficient because Laing failed to consult with Tschannen or Delgado's direct supervisors.  The law does not require a perfect interactive process.  The  interactive process "is a *means* for identifying a reasonable accommodation rather than an end in itself." *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 503 (7th Cir. 2020) (emphasis in original) (internal quotes and citation omitted).  An imperfect interactive process does not change the outcome unless Delgado shows that a reasonable accommodation was available within her medical restrictions. *Williams v. Union Pac. R.R. Co.*, 2021 WL 4502181, at *7 (N.D. Ill. Oct. 1, 2021) (the employer's "decisionmakers weren't required to consult with [plaintiff's] direct supervisor about accommodations" where plaintiff failed to show that failures in the interactive process prevented the identification of a workable accommodation).

Regarding the interactive process, Laing, Daloia, Perez, and Delgado met to determine whether there was a reasonable accommodation that would allow Delgado to perform the essential function of her Packer/Peeler position. PRDSOF ¶ 39.  During the meeting, they discussed Delgado's permanent medical restrictions and the essential job functions of the Packer/Peeler position as well as any vacant job for which she was qualified and could perform with or without a reasonable accommodation. *Id*. at ¶ 40; Doc. 27-1, Def's Ex. 13, Laing Dep. 34:19-35:9; Def's

---

[10] If Delgado had produced evidence showing that she was capable of performing the essential functions of her Packer/Peeler position with a particular accommodation and Smithfield failed to reasonably accommodate her, then Smithfield would have the opportunity to show that the requested accommodation would create an undue hardship on its operations. *Conners*, 984 F.3d at 1262.

Exs. 22-24. Laing also testified that the "interactive process has nothing involved with the superintendent [Tschannen]. It's strictly an HR function." Def's Ex. 13, Laing Dep. 37:5-7. This evidence does not show that Laing was mistaken about the fact that there were no positions at the St. Charles Plant within Delgado's medical restrictions. Moreover, even if Smithfield had failed to engage in the process, "that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013); *Sansone*, 917 F.3d at 980. To survive summary judgment, Delgado had to show that Laing's alleged shortcomings prevented the identification of an appropriate accommodation. *Igasaki v. Illinois Dep't of Fin. & Pro. Reg.*, 988 F.3d 948, 961 (7th Cir. 2021). She failed to do so. In short, the record contains no evidence from which a reasonable jury could find that Smithfield failed to accommodate Delgado's disability.

As a whole, Delgado fails to raise a genuine issue of material fact as to whether she is a "qualified individual" with a disability and whether Smithfield refused to make reasonable accommodations that would allow her to perform the essential functions of her Packer/Peeler job. Accordingly, the Court grants Smithfield's motion for summary judgment on Delgado's failure to accommodate claim.

**B. Discriminatory Termination**

To prevail on an ADA discrimination claim for disparate treatment, a plaintiff must show that: "(1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by her disability." *Stelter*, 950 F.3d at 490. Like the failure to accommodate claim, Smithfield argues that Delgado's claim that Smithfield unlawfully terminated her because of her shoulder condition in

violation of the ADA fails because she cannot establish that she could perform the essential functions of her job with or without reasonable accommodation. Doc. 26 at 9-15. Delgado asserts in her Complaint that her "termination, because of her handicap or disability, violated her rights under the American[s] [with] Disabilit[ies] Act." Compl., Doc. 1, ¶ 9. In her response to Smithfield's motion for summary judgment, however, Delagado does not address her apparent discriminatory termination claim. Doc. 35 at 9-16. She focuses solely on her failure to accommodate claim and hostile work environment claim. *Id*. Delgado has thus abandoned a discriminatory termination claim by failing to specifically respond to Smithfield's summary judgment motion on this issue. *Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) (plaintiff abandoned claim by failing to address it in his opposition to summary judgment). Even so, Delgado's discriminatory termination claim depends on her being a "qualified individual." *Cenanovic v. Hamdard Center for Health and Human Services*, 2024 WL 1363466, at *7 (N.D. Ill. March 28, 2024). And as previously discussed, Delgado has failed to establish that she is a qualified individual with a disability which is required to prevail on a discriminatory termination claim. Accordingly, Smithfield is entitled to summary judgment on Delgado's discriminatory termination claim under the ADA and IHRA.

**C. Hostile Work Environment**

Delgado next claims that she was subjected to a hostile work environment at Smithfield on the basis of her shoulder injury. Smithfield argues it is entitled to summary judgment on Delgado's hostile work environment claim on two grounds. First, Smithfield argues that some of Delgado's allegations of harassing conduct have no clear connection to her shoulder injury. Second,

Smithfield asserts that Delgado's contentions and any evidence supporting them fail to establish a sufficiently severe or pervasive working environment.[11]

"Hostile work environment claims are cognizable under the ADA." *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 851 (7th Cir. 2019). To survive summary judgment on her hostile-work-environment claim, Delgado must produce evidence that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her disability; (3) the harassment was so severe or pervasive, both subjectively and objectively, so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Id.* at 856; *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). "A hostile work environment is based on the totality of the circumstances," considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021) (internal quotes and citation omitted). A workplace rises to the level of an objectively hostile work environment only

---

[11] Smithfield also contends that "harassment must be based on the harassee's membership in a protective class, *i.e.* a qualified individual with a disability." Doc. 26 at 19. In other words, Smithfield argues that Delgado must establish that she is qualified individual with a disability to a state a hostile work environment claim on the basis of disability. This "skeletal" argument in its opening memorandum, which was "really nothing more than an assertion," was insufficient to preserve the issue. Doc. 26 at 12; *see United States v. Snyder*, 71 F.4th 555, 567 (7th Cir. 2023); *see also Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived."); *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[T]his court has repeatedly and consistently held that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). It was not until Smithfield's reply brief that this argument was developed but that was "too little, too late." Doc. 40 at 5-6; *id*; *see Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 451 (7th Cir. 2021) ("He began to add some color to the argument in his reply brief, but 'arguments not fully developed until a reply brief are waived.'"); *Bitsin v. Holder*, 719 F.3d 619, 630 n.23 (7th Cir. 2013) ("[Plaintiff] only fully developed this argument in his reply brief, and, therefore, the argument is waived.").

if it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ford*, 942 F.3d at 851 (internal quotes and citation omitted).

Delgado claims the following incidents and comments created a hostile work environment based on her disability: (1) Tschannen was rude to Delgado when she reported her workplace injury on March 27, 2017 and did not immediately arrange for transportation to the hospital, refusing to acknowledge her considerable pain (PRDSOF ¶ 24; PSOAF ¶¶ 3-5); (2) When Delgado arrived at the St. Charles Plant on March 28, 2017 to discuss her injury, Laing allegedly spoke to her in a rude tone of voice and told her that she would need to report for light duty in the afternoon instead of the morning when light duty work usually occurred (PRDSOF ¶ 25; PSOAF ¶ 7); (3) on July 27, 2017, Delgado arrived late to work due to a doctor's appointment and Laing told her to make her doctor's appointments in the morning so she would be on time to work (PSOAF ¶ 11; *see also* PSOAF ¶ 26)[12]; (4) On approximately four or five occasions, Delgado allegedly experienced difficulties with the ride service arranged through Smithfield's workers' compensation program to transport her to and from work when she was not permitted to drive because of her shoulder injury (PRDSOF ¶ 27; PSOAF ¶¶ 9, 10)[13]; (5) On one occasion in mid-2017, Laing allegedly asked Delgado in a rude tone when she would be able to drive because her

---

[12] Laing testified that he did not recall telling Delgado to schedule her doctor's appointments in the morning to be on time to work and that "[t]he safety manager works directly on scheduling the appointments." Doc. 27-1, Def's Ex. 13, 20:19-21:1.

[13] At her deposition, Delgado speculated that Smithfield personnel may have forgotten to arrange her ride service because "they were upset that I wasn't getting better faster" but then said, "I don't know." PRDSOF ¶ 27. Delgado did not know who at Smithfield was responsible for arranging the ride service she used. *Id*. She also testified that no one ever told her they were not arranging a taxi for her because they thought she should be getting better faster. *Id*.

driving restriction was costing the company too much money (PRDSOF ¶ 26; PSOAF ¶ 10)[14]; (6) In or about late October 2017, Superintendent Tschannen allegedly counseled Delgado on her job performance at the peeling table and loudly told her to "move your arm" and "use your left arm more" in front of her coworkers, which caused Delgado to feel humiliated and embarrassed and she believes showed a lack of sympathy and compassion on Tschannen's part for how much pain she was in (PRDSOF ¶ 28; PSOAF ¶ 13)[15]; (7) After Tschannen walked away, two coworkers allegedly teased Delgado about how she could not cut the sausages properly (PRDSOF ¶ 29; PSOAF ¶ 14); (8) On one occasion in January 2018, while Tschannen observed Delgado doing a packing job where she was having difficulty keeping up with the line, he told her to "Pack faster," "Lift your arm up," "Lift your left arm," the "The doctor said you are able to do it," and "Talk to your doctor," which caused Delgado to cry because her co-workers were staring, and later Tschannen gave Delgado a verbal warning for not "pack[ing] fast enough," causing her to cry again (PRDSOF ¶ 30; PSOAF ¶¶ 16-18)[16]; (9) after the verbal warning, Delgado started taking more pain pills in order to keep up with the speed of the line (PSOAF ¶ 22); (10) On one occasion, Tschannen allegedly took pictures or videos on his cell phone of Delgado performing packing

---

[14] Laing testified during his deposition that he does not recall telling Delgado her taxi service cost too much money, and that the service does not "directly or indirectly" cost Smithfield because it is arranged "through the TPA because we use a third-party administrator for workers' comp administration." Doc. 27-1, Def's Ex. 13, 19:12-21.

[15] When asked about this alleged interaction at his deposition, Tschannen testified: "I don't recall anything like this ever happening." Doc. 27-1, Def's Ex. 3, 33:15-34:19.

[16] Tschannen testified that he recalled speaking with Delgado on the line and observing her doing the job, but he does not recall her crying, telling her to lift her arm up, stating her doctor said she could do it, or issuing her a verbal warning. Doc. 27-1, Def's Ex. 3, 35:7-39:6. It is undisputed that Delgado never received any other verbal warning and never received any written warnings. PRDSOF ¶ 30.

work (PRDSOF ¶ 31)[17]; (11) On one occasion, Production Supervisor Rob Taylor allegedly attempted to train Delgado on a new job task requiring her to put slices in a plastic pouch, which she said she could not perform because she would have to stretch out her left arm, and ultimately, she was not able to perform the task (PRDSOF ¶ 32; PSOAF ¶ 21); (12) When Delgado could not put slices in a plastic pouch, Taylor said: "You couldn't do it? Well then, you're going to pack," and he began increasing the number of hours Delgado was packing a day, including sometimes three to four hours a day and on one day, she had to pack for 5 hours (PSOAF ¶¶ 21, 22)[18]; (13) Several times between December 2018 and March 2019, three different supervisors allegedly raised their thumbs to indicate that the speed of the production line should increase while Delgado was working (PRDSOF ¶ 33)[19]; and (14) In July 2019, an unidentified colleague allegedly told Delgado that he overheard someone say that her employment with Smithfield was going to be terminated (PRDSOF ¶ 34).[20] During her deposition, Delgado testified that she did not report any of these incidents which form the basis of her hostile work environment claim to her supervisors, to Human Resources, or to Smithfield's complaint hotline. PRDSOF ¶ 35. She further testified

---

[17] During his deposition, Tschannen testified that he did not recall ever taking any pictures or videos of Delgado. PRDSOF ¶ 31. Delgado also testified during her deposition that Tschannen never showed her any pictures or videos he had taken of her on his phone. *Id.*

[18] Delgado claims that she was "only supposed to be [packing] one or two hours per day," but her Transition Duty Assignment and Offers from October 2017 and November 2018 do not indicate that she was restricted in the amount of time she could spend packing with her right hand. PSOAF ¶ 22 (citing Doc. 27-1 at 252); Doc. 27-1, Def's Exs. 14, 15. Tschannen explained that as part of a Packer/Peeler's "general rotation at that time" an "employee would pack for one, maybe two hours through the course of the day." Doc. 27-1, Ex. 3, 39:20-40:6.

[19] During her deposition, Delgado testified that although she believed this conduct was directed at her, none of the supervisors referenced her arm injury or her name when indicating that the line should speed up. PRDSOF ¶ 33.

[20] This individual did not tell Delgado who he heard this from or give any explanation regarding why he thought she was going to be let go. PRDSOF ¶ 34.

that during her employment with Smithfield, she was never demoted and her compensation was never decreased. *Id.* at ¶ 36.

Smithfield primarily argues that Delgado fails to show that the alleged conduct was sufficiently severe or pervasive to alter the conditions of her employment because it "consist[s] of innocuous comments made by her colleagues or supervisors sporadically over a period of two years." Doc. 26 at 14.[21]  But the severe or pervasive inquiry is generally reserved for the jury. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury.").  Moreover, the Seventh Circuit has also directed district courts to consider the broader context of the alleged harassment:

> What to make of [the harasser's behavior] . . . is a task that requires one to weigh the tone of his words and deeds and a host of other intangibles that the page of a deposition or an affidavit simply do not reveal. *This is a task for the factfinder after trial, not for the court on summary judgment.*

*Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir. 1999) (emphasis added).

While a close call, when the totality of the evidence is viewed in the light most favorable to Delgado and all reasonable inferences are drawn in her favor, the Court finds Delgado has provided just enough evidence to submit to the jury the question of whether her harassment was

---

[21] Smithfield further argues that Delgado has failed to demonstrate that certain of the alleged incidents were based on her disability. *Demkovich*, 3 F.4th at 977; *Ford*, 942 F.3d at 856.  The Court agrees in part. Delgado admitted that she did not know if the difficulties with the ride service arranged through Smithfield's workers' compensation program (incident 4) were because of her shoulder injury.  Delgado similarly fails to make any connection between her shoulder injury and the conduct of the three unidentified supervisors who increased the speed of the production line while she was working (incident 13) and the unidentified colleague's comment that Smithfield planned to terminate her employment (incident 14). These incidents which were not based on her disability could not create a hostile work environment on the basis of a protected characteristic. *Brooks*, 39 F.4th at 441; *Cole v. Bd. of Tr. of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (internal quotes and citation omitted) ("Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a" protected minority.).

"severe or pervasive." Specifically, this evidence includes, but is not limited to: (1) the Plant Human Resources Manager (Laing) asking Delgado when she would be able to drive because her driving restriction was costing the company too much money; (2) the Production Superintendent (Tschannen) counseling her job performance and loudly telling her to "move your arm" and "use your left arm more" in front of co-workers; (3) the same Production Superintendent (Tschannen) observing Delgado struggling to keep up with the speed of the line and telling her to "Pack faster," "Lift your arm up," "Lift your left arm," the "The doctor said you are able to do it," and "Talk to your doctor"; and (4) the Production Supervisor (Taylor) requiring Delgado to perform a new task she told him she could not perform because of her disability and when she was unable to perform that task, increasing the amount of time she had to perform packing with only her right arm, including up to five hours on one occasion.

These incidents and comments were directed at Delagado from Smithfield's supervisors, clearly related to her disability, and were overtly hostile to her physical limitations. The Seventh Circuit views harassing conduct by supervisors as more severe than the same behavior by a co-worker. *See Gates v. Board of Educ. of the City of Chicago*, 916 F.3d 631, 638 (7th Cir. 2019) ("We have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's."). This is "particularly true when supervisors address these derogatory and humiliating remarks directly to the employees in question." *Id; Scaife v. United States Department of Veterans Affairs*, 49 F.4th 1109, 1116 (7th Cir. 2022) (remarks addressed "directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand."). In addition, the second and third of these incidents humiliated Delgado in front of her coworkers and Delgado cried because of the third incident. Immediately after the second incident, Delgado's co-workers teased her about her inability to cut meat with her physical restrictions. Further, the third incident

ended with Delgado receiving a verbal warning for not being able to "pack fast enough" and she then began taking more pain pills to keep up with the speed of the line. Given Tschannen's comments criticizing Delgado's job performance on the basis of her disability and his obvious frustration regarding her disability needs, a reasonable jury could infer that he subjected her to other scrutiny related to her shoulder injury by taking pictures or videos on his cell phone of Delgado performing packing work.[22]

Reviewing this record in the light most favorable to Delgado, though certainly not overwhelming, these four supervisor incidents and comments made directly to Delgado which were obviously related to her disability, considered in conjunction with the other evidence of harassment having some connection to Delgado's disability, could permit a reasonable jury to conclude that Delgado was subject to a hostile work environment on account of her disability. *See Johnson v. Soo Line Railroad Co.*, 2022 WL 540758, at *13 (N.D. Ill. Feb. 23, 2022), *reconsideration denied*, 2023 WL 199338 (N.D. Ill. Jan. 17, 2023) (four alleged comments, including three racially-charged remarks, by a manager and a crew foreman raised a jury question as to whether plaintiff experienced a severe or pervasive working environment based on race); *cf.*

---

[22] The Court rejects Smithfield's contention that Delgado's reliance on her self-serving deposition testimony and answers to interrogatories is insufficient to survive summary judgment. Smithfield does not suggest that Delgado's testimony is not based on personal knowledge or that it is otherwise inadmissible at trial. *See* Fed. R. Evid. 602. The Seventh Circuit has "repeatedly emphasized, . . . the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013); *Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) (explaining that "*[e]verything* a litigant says in support of a claim is self-serving, whether the statement comes in a complaint, a-n affidavit, a deposition, or a trial" and "[y]et self-serving statements are not necessarily false; they may be put to the test before being accepted, but they cannot be ignored") (emphasis in original). Moreover, the summary judgment rule itself contemplates that parties may submit deposition testimony and interrogatory answers as evidence for purposes of determining whether a genuine issue of material fact exists. Fed. R. Civ. P. 56(c)(1)(A); *see also Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993 (a "nonmoving party's own affidavit or deposition will constitute affirmative evidence to defeat a summary judgment motion."). Accordingly, Delgado's deposition testimony and answers to interrogatories are legitimate methods to create a genuinely disputed fact at the summary judgment stage.

*Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 856-57 (7th Cir. 2019) (finding that two incidents where a co-worker told plaintiff she would be required to prove her disability in order to avoid shifts in the Main Control Office and another co-worker questioned whether plaintiff was in as much pain as she claimed, were not severe or pervasive enough to create a hostile work environment); *Simpson v. DeJoy*, 2021 WL 6124885, at \*1-2 (7th Cir. 2021) (finding no hostile work environment based on disability where the plaintiff's co-workers laughed at her and remarked about her needing a babysitter and her supervisor once reprimanded her for cursing at a customer).  By a narrow margin, the Court denies summary judgment on Delgado's claim for disability-based harassment.

### III.  Conclusion

For these reasons, the Court denies Smithfield's motion for summary judgment [25] on Delgado's hostile work environment claim under the ADA and IHRA and grants summary judgment on Delgado's failure to accommodate claim under the ADA and IHRA and discriminatory termination claim under the ADA and IHRA.

**SO ORDERED.**

Dated:  July 10, 2024

Sunil R. Harjani
United States Magistrate Judge

28